**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**BECKLEY DIVISION**

| | |
|---|---|
| _____ ) | |
| CATHY L. HAGER, ) | CIVIL ACTION NO: 5:19-CV-00484 |
| ) | |
| on behalf of herself and all ) | |
| others similarly situated, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| OMNICARE, INC. ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HER MOTION FOR CONDITIONAL CERTIFICATION OF COLLECTIVE ACTION AND COURT-SUPERVISED NOTICE PURSUANT TO 29 U.S.C. § 216(b)**

Plaintiff brings this case as a collective action under the Fair Labor Standards Act ("FLSA") on behalf of herself and other drivers who have delivered medication for Defendant Omnicare, Inc., and who were classified as independent contractors. The allegations in this case are materially identical to the allegations in at least two other federal lawsuits that have already been collectively certified under the FLSA. This Court has previously certified a collective action of West Virginia delivery drivers seeking unpaid wages against Omnicare. *See Young v. Act Fast Delivery of W. Virginia, Inc.*, No. 5:16-CV-09788, 2017 WL 3445562, at *4 (S.D.W. Va. Aug. 10, 2017). In *Young*, this Court also found that Omnicare was the legal employer of its delivery drivers as a matter of law, and that such drivers were not independent contractors. *See Young v. Act Fast Delivery of W. Virginia, Inc.*, No. 5:16-CV-09788, 2018 WL 279996, at *9 (S.D.W. Va. Jan. 3, 2018).

More recently, a federal district court in Kentucky conditionally certified an FLSA collective action of Kentucky delivery drivers seeking unpaid wages against Omnicare. *See Davis v. Omnicare, Inc.*, No. 5:18-CV-142-REW, 2019 WL 6499127, at *13 (E.D. Ky. Dec. 3, 2019) (conditionally certifying a collective of Omnicare delivery drivers in Kentucky).[1]

In the context of these related cases, and through additional research and fact-gathering efforts, Plaintiff's counsel has determined that the unlawful wage underpayment scheme at issue reaches far beyond West Virginia and Kentucky. It extends nationwide. Omnicare economically exploits its delivery drivers in a materially identical scheme in all forty-seven (47) states in which Omnicare does business. Accordingly, and as set forth in greater detail below, Plaintiff respectfully moves for conditional nationwide certification of this lawsuit under the FLSA to hold Omnicare accountable for its ongoing failure to pay statutorily mandated minimum wages

---

[1]   Plaintiff's counsel is involved in the prosecution of these other cases.

and overtime premiums to its pharmaceutical delivery drivers.

## I. INTRODUCTION

Defendant Omnicare, Inc. ("Omnicare") is "a Cincinnati-based pharmaceutical services company specializing in the sale, delivery, and distribution of medicine, medical devices (herein jointly referred to as 'pharmaceutical products'), and pharmaceutical services throughout the United States." Dkt. 1 at ¶ 10. Omnicare conducts business "in at least forty-seven (47) states in the United States, including West Virginia." Dkt. 1 at ¶ 4. Pharmaceutical deliveries are the core of Omnicare's entire business. *See, e.g.,* Ex. 1 to Shuford Decl. (Ex. A) at 1 (an Omnicare bid document indicating that it provides daily delivery via "carriers familiar with the delivery needs of our customers" and that it services "top 20 national congregate living chains" nationwide).

In fact, Omnicare publicly (in recent job postings) refers to its delivery drivers as the "face of the company" and "crucial" to its business. *See* Ex. 2 to Shuford Decl. (Ex. A) ("[A]s the 'face of the company' delivery is crucial to excellent customer service and represents a large risk factor in customers deciding to stay with or leave Omnicare."). In violation of the FLSA, however, Omnicare remarkably claims (for wage payment purposes) that these "crucial" delivery drivers are not its employees, but merely independent contractors. Indeed, to avoid its statutory obligations to pay overtime premiums and minimum wages to its delivery drivers, Omnicare has willfully engaged in a nationwide misclassification scheme of its drivers as purported independent contractors. For example, in a 2017 master "Omnicare Courier Agreement" encompassing at least 7 states, Omnicare brazenly repudiated any obligation to comply with "federal and state wage-hour obligations (including overtime)." *See* Ex. B at 17, §37.

Plaintiff will show that there are Omnicare delivery drivers across the country who are not paid overtime or minimum wages because they are not reimbursed for significant vehicle expenses despite being required to drive their personal vehicles hundreds or thousands of miles

per week. Indeed, in selecting regional courier companies, Omnicare endeavors to keep costs as low as possible (*see* Borman Dep. Excerpts at 15, attached as Ex. C) and its master agreement expressly disclaims any responsibility "for the maintenance and operations of all vehicles" used to provide delivery services for Omnicare. *See* Ex. B at 7, §12(iii).  Omnicare's entire business model rests upon a purposeful misclassification scheme that results in rampant FLSA violations.

To stop this scheme and remedy these violations, Plaintiff Hager respectfully asks this Court to authorize Plaintiff to issue notice to other similarly situated Omnicare delivery drivers by conditionally certifying this case as a collective action defined as follows:

> **All individuals who delivered pharmaceutical products for Omnicare nationwide to Omnicare's customers, clients, or business partners, (from June 28, 2016 to the date the Court authorizes notice), and who were classified as independent contractors.**

*See* 29 U.S.C. § 216(b). Because FLSA collective actions require putative class members to "opt-in," courts routinely allow FLSA notice to be issued at the outset of an FLSA collective action prior to discovery.[2] Under the FLSA's unique statutory scheme, "plaintiff's burden at this initial [conditional certification] stage is fairly lenient, requiring only a modest factual showing that members of the proposed class are 'victims of a common policy or plan that violated the law." *Gordon v. TBC Retail Grp., Inc.*, 134 F. Supp. 3d 1027, 1031 (D.S.C. 2015) (internal citation

---

[2]     *See Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 171 (1989) (discussing the importance of early notice in collective actions). Furthermore, an opt-in plaintiff's statute of limitations continues to run until he or she has filed a consent to join the lawsuit; therefore, the limitations period is not tolled with respect to other putative class members until he or she files a consent with the court opting-in. 29 U.S.C. 256; *Sandoz v. Cingular Wireless, LLC*, 553 F.3d 913, 916-17 (5th Cir. 2008) (citing *Atkins v. Gen. Motors Corp.*, 701 F.2d 1124, 1130 n. 5 (5th Cir. 1983). As a result, each day that goes by before other delivery drivers are provided with notice and an opportunity to file a consent to opt-in to the present action is one less day for which he or she may recover the wages owed by Defendant. In addition, the standard for obtaining authorization for notice, or conditional certification, under § 216(b) is far more lenient than the standard for obtaining class certification under Fed. R. Civ. P. 23. *Perez v. RadioShack Corp.*, 386 F.Supp.2d 979, 991 (N.D. Ill. 2005) (the FLSA's "similarly situated requirement has been interpreted as 'considerably less stringent' than that applied to class actions certified under Rule 23").

omitted) (granting nationwide conditional certification of a collective of automobile mechanics).
*See also Rosinbaum v. Flowers Foods, Inc.*, 238 F. Supp. 3d 738, 747 (E.D.N.C. 2017) ("[E]ven
if potential plaintiffs' circumstances are not identical, conditional certification is appropriate
where persons raise a similar legal issue as to…nonpayment or minimum wages or overtime
arising from at least a manageably similar factual setting." (internal citations omitted)). Courts
routinely grant conditional certification and authorize notice in cases involving misclassification
schemes, including in cases involving joint employer allegations and/or pharmaceutical delivery
drivers. *See Young*, 2017 WL 3445562 (conditionally certifying a collective of Omnicare
delivery drivers and dispatchers in West Virginia); *Bryant v. Act Fast Delivery of Colorado, Inc.*,
C.A. No. 14-CV-00870-MSK-NYW, 2015 WL 3929663, at *1 (D. Colo. June 25, 2015)
(conditionally certifying a collective of delivery drivers where "Plaintiffs were required to report
to OmniCare's warehouse, pick up a set of deliveries, make those deliveries according to
OmniCare's instructions, and then return to the warehouse for their next set of deliveries.");
*Hose v. Henry Indus., Inc.*, 49 F. Supp. 3d 906, 909 (D. Kan. 2014) (conditionally certifying a
collective of pharmaceutical delivery drivers); *Davis*, 2019 WL 6499127, at *13 (E.D. Ky. Dec.
3, 2019) (conditionally certifying a collective of Omnicare delivery drivers in Kentucky).[3] In
*Sullivan-Blake v. FedEx Ground Package Sys., Inc.*, No. CV 18-1698, 2019 WL 4750141 (W.D.
Pa. Sept. 30, 2019), the Court recently conditionally certified a nationwide collective of FedEx
drivers in view of a strikingly similar misclassification scheme where FedEx contracts with
"independent service providers ('ISPs')" who in turn contract with drivers who physically pickup
and deliver packages based on 2 declarations from Plaintiffs and "a 10-K which describes

---

[3]     In her complaint, Plaintiff expressly carved out Kentucky drivers in view of *Davis*, *supra*.
*See* Dkt. 1 at ¶ 2, n. 1.  Regardless, the information submitted herein from the docket in *Davis* is
strong evidence that Omnicare's misclassification scheme is nationwide.

FedEx's shift to the ISP Model nationwide." *Id*. at *4.

For these reasons, and as described in more detail below, Plaintiff respectfully requests that the Court: (1) conditionally certify a class of similarly situated delivery drivers; (2) direct prompt disclosure by Defendants of the contact information for the putative class members; and (3) authorize Plaintiff's counsel to notify prospective class members of their right to opt-in to this lawsuit under 29 U.S.C. § 216(b).

## II.    FACTUAL BACKGROUND

### A.    Omnicare's Pharmaceutical Delivery Business Is Nationwide, It Subcontracts with Intermediary Courier Companies Across the Country, and It Has Uniformly Claimed That All Putative Class Members Nationwide Are Not Its Employees

Omnicare is "a Cincinnati-based pharmaceutical services company specializing in the sale, delivery, and distribution of medicine, medical devices (herein jointly referred to as 'pharmaceutical products'), and pharmaceutical services throughout the United States." Complaint at ¶ 10. Omnicare conducts business "in at least forty-seven (47) states in the United States, including West Virginia." Complaint at ¶ 4. Indeed, according to Omnicare's website, "it is a national provider of long-term care pharmacy services delivering more than 70 million prescriptions a year to skilled nursing facility customers nationwide." Ex. 3 to Shuford Decl. (Ex. A) at 1. To make these deliveries to Omnicare's customers nationwide, Omnicare "subcontracts with regional delivery companies, who contract with pharmaceutical delivery drivers to provide delivery services to Defendant's customers, consistent with Defendant's contractual obligations to its customers." Dkt.1 at ¶ 12. *See also*, Johnson Dep. Excerpts (dated June 20, 2019) at 17-18, attached as Ex. D.

Plaintiff has alleged that Omnicare is a statutory employer of its delivery drivers, despite treating its delivery drivers as non-employee independent contractors. Omnicare accomplishes its

misclassification scheme by jointly employing delivery drivers with courier companies that it contracts with while simultaneously disclaiming employment liability from its drivers. *See* Ex. B at 17, §37. In denying its delivery drivers the statutory protection of employment status, Omnicare fails to ensure that its delivery drivers are paid minimum wages and overtime as required by the FLSA. Omnicare has answered Plaintiff's complaint and uniformly claimed that none of the putative collective members who make deliveries for Omnicare nationwide are its employees entitled to relief under the FLSA. *See* Dkt. 28 at 7 (Third Affirmative Defense).

Omnicare's scheme to subcontract with regional delivery companies across the nation to perform its essential delivery work while evading its employment obligations is outlined in the "Omnicare Courier Agreement" that Omnicare filed as an exhibit to its Answer in *Davis, supra*. *See* (Ex. B).[4] This master Omnicare Courier Agreement shows that Omnicare contracts for delivery services across a broad and diverse geographic scope. Moreover, it validates many of the key allegations made in Plaintiff's complaint, including that:

- Omnicare subcontracts with regional courier companies, who in turn contract with delivery drivers to provide delivery services to Defendant's customers. See Dkt. 1 at ¶ 12.
- These regional courier companies "have contracts with Defendant that expressly govern critical terms and conditions of delivery drivers[s'] work (such as hiring and firing standards and the manner in which delivery work for Defendant must

---

[4]    Omnicare's nationwide subcontracting misclassification scheme has been implemented by senior-level Omnicare executives, such as Omnicare's former Vice President of Strategic Sourcing and Real Estate, Jonathan Borman. Borman Dep.Excerpts (Ex. C) at 6-7. Up until June 2016, Mr. Borman controlled an $800 million purchasing budget for Omnicare, Inc., spent throughout its 200 locations nationwide, including Omnicare's pharmacies located in Nitro and Morgantown, West Virginia. *Id*. at 7-8. His purchasing responsibilities included delivery services. *Id*. at 8. Mr. Borman explained that Omnicare created and negotiated the courier contracts that govern delivery services around the country. *Id*. at 11-14. Courier contracts negotiated by Omnicare executives and agents include details about the services to be provided by delivery drivers to Omnicare's customers. *Id*. at 27-29. Further, Omnicare's goal in negotiating these agreements is to keep these delivery contract costs "as low as possible" "[b]ecause that would increase the profits of Omnicare, Inc." *Id*. at 15. At the same time, Omnicare has disclaimed any liability under the FLSA to pay deliver drivers at least the minimum wage or overtime premiums. *See* Dkt. 28 at 7; Ex. B at 17, §37.

be performed)." *Id.* at ¶ 14.

- Omnicare mandates these contractual terms so that it can establish and maintain control over the services performed by delivery drivers. *Id.* at ¶ 15.
- Omnicare has the unilateral power to terminate delivery drivers. *Id.* at ¶ 23.
- Omnicare dictates routes to be performed by drivers and guards its business interest by monitoring delivery driver work and performance. *Id.* at ¶ 29
- Omnicare requires regional courier companies to supervise drivers and provide compliance training and instructions to delivery drivers to "further Defendant's business interests and promote compliance with its policies." Id. at ¶ 31.
- Delivery drivers are not reimbursed for any vehicle-related expenses. *Id.* at 21.
- Omnicare fails to take any responsibility for complying with the FLSA, including ensuring the payment of minimum and overtime wages; delivery drivers are often denied minimum wages and overtime. *Id.* at 38-42.

This master Courier Agreement[5] is between "CVS Pharmacy, Inc…on its own behalf

and on behalf of its subsidiaries and affiliates, including Omnicare, Inc." and "Courier." (*See* Ex.

B at 1.) "Courier" is defined in the agreement as including the following regional courier

companies:

> The Act Fast Delivery (AFD) Companies: AFD of Coastal Bend, Inc.; AFD of New Mexico, Inc.; AFD of San Antonio, Inc.; AFD of Travis County, Inc.; AFD of Tyler, Inc.; AFD of Texas, Inc.; AFD of Tennessee, Inc.; AFD of Ohio, Inc.; AFD of Kentucky, Inc.The PowerForce Companies: PowerForce of Oklahoma, Inc.; PowerForce, Inc.; PowerForce of Denver, Inc.; PowerForce of Houston, Inc.; PowerForce of Texas, Inc.; Rush Courier, Inc.

*Id.* at 1-2. According to the Agreement, signed by CVS on behalf of Omnicare on May 4, 2017,

Omnicare's drivers must pass background checks and drug tests as required by Section 14 of the

Courier Agreement (*see* Courier Agreement at 6) [6] and must be qualified in or receive training

---

[5]      This exemplar master "Omnicare Courier Agreement," on its face, appears to be a template agreement drafted by Omnicare and/or its parent company, CVS, revised October 24, 2016. *See* bottom of each page of the Agreement, reflecting the revision date. As Plaintiff has declared, "delivery drivers are required to interact with Omnicare's customers and clients at nursing homes and similar facilities on a daily basis to perform their work for Omnicare." Hager Decl. (Ex. E) at ¶ 8.  Indeed, given this role, Omnicare has referred to Plaintiff and other delivery drivers "as the 'face of the company'" and "crucial to excellent customer service[,] represent[ing] a large risk factor in customers deciding to stay with or leave Omnicare." *See* Ex. 2 to Shuford Decl. (Ex. A) at 1.

[6]      In the Courier Agreement that Omnicare filed with the Court, Omnicare redacted Section 14 of the Agreement, but it expressly referred to its background and drug testing requirements in Section 12 which was not redacted. *See* Ex. B at 6, §12(ii). Further, a reasonable inference can be

concerning "HAZMAT regulations and the handling of controlled substance." Ex. B at 7, §13. Drivers must also receive "infection control training, including in hand hygiene techniques, reporting contagious diseases and infection control precautions." *Id*.

The agreement defines "Courier Services," i.e., the work performed by delivery drivers, as: "the pickup, transportation, delivery, delivery receipt confirmation and reporting, by Courier[7] of Property to consignors and consignees specified by Pharmacy, **by vehicle delivery, in accordance with the Shipment Schedule or as otherwise directed by Pharmacy**." Ex. B at 2, §1 (emphasis added).[8] Moreover, "[t]o ensure security at [Omnicare's] pharmacies and long-term care facilities, drivers' uniforms shall include clearly visible photograph identification." Ex. B at 6, §12(ii); *See also* Decl. of Hager (Ex. E) at ¶ 19 (provided a photo identification card that she was required to wear while making deliveries for Omnicare and to access Omnicare's Nitro, WV pharmacy); Decl. of Messick (Ex. F) at ¶ 15 ("Delivery drivers are required to wear an identification badge when performing their work for Omnicare."). Further, Omnicare, via its parent company, CVS, maintains control over the right to terminate or otherwise replace any delivery driver. *See* Ex. B at 7, §12(iii) ("On request of CVS, Courier agrees to **substitute or replace any person performing Courier Services under this Agreement** if CVS determines that such substitution or replacement is in the best interest of CVS or patient care, and **provided the substituting or replacing personnel meets all requirements under this Agreement**.")

---

drawn that some of the redacted information would support Plaintiff's claims here.

[7]     The Agreement further defines "Courier" as the regional courier companies "and their officers, agents, representatives, **contractors, sub-contractors** and employees." Ex. B at 1, §1 (emphasis added)

[8]     When Omnicare prepares to submit a request for proposal for delivery services to courier companies, they attached a "Schedule" detailing specific routes concerning the requested services. *See* Borman Dep. Excerpts (Ex. C) at 35-37. As reflected in Omnicare's master courier agreements, courier companies could not deviate from the scheduled routes without Omnicare's permission.

(emphasis added).[9]

      **B.**      **Delivery Drivers Across the Country: (1) Are required to Work for Omnicare As Independent Contractors; (2) Must Use Their Personal Vehicles to Perform the Same or Substantially Similar Delivery Work That Is Core to Omnicare's Nationwide Business; and (3) Are Not Paid Minimum Wages For All Hours Worked or Overtime Premiums**

Declarations from the Plaintiff and Omnicare delivery drivers from the South, Northeast, Midwest, and West reflect that Omnicare delivery drivers across the country are classified as independent contractors working for Omnicare's courier companies, are often required to use their personal vehicles to make deliveries for Omnicare to its customers, and are common victims of Omnicare's pervasive FLSA minimum wage and overtime violations.[10] *See* Declarations of Hager (Ex. E), Abid (Ex. G), Messick (Ex. F), Davis (Ex. H), and Kepford (Ex I).[11]

      For example, Eugene Messick is a current Omnicare delivery driver whose work is based out of Omnicare's West Chester, Ohio facility.  Ex. F at ¶¶ 1, 17.  As reflected by the 16-year tenure of Mr. Messick, who has made deliveries to Omnicare's customers in Ohio, Indiana, and Kentucky, the core work of delivery drivers does not change regardless of the intermediary

---

[9]      Notwithstanding the extensive "personnel…requirements under th[e] Agreement," (Ex. B at 7, §12 (iii)) Omnicare claims that the agreement should not be construed as making it a "joint employer" with the regional courier companies and that "Courier is not an employee" of Omnicare. *Id*. at 16, §31. Omnicare further repudiates any obligation to comply with "federal and state wage-hour obligations (including overtime)" (*Id*. at 17, §37) and any obligation "for the maintenance and operation of all vehicles and equipment" (*Id*. at 7, §12(iii)) associated with the work of delivery drivers. Drivers are economically dependent on Omnicare to receive payment for their services to Omnicare, as the Agreement further prohibits delivery drivers and the regional delivery companies they nominally work for from billing any "patient or any third-party payor" (i.e., Omnicare's customers) for the Courier Services provided by its delivery drivers "for any reason whatsoever." *Id*. at 8, §15.

[10]     In addition to these declarations, the exemplar master Omnicare Courier Agreement itself on its face covers many states across a broad geographic scope. *See* Ex. B at 1-2, §1.

[11]     Plaintiff acknowledges that some of the declarations attached hereto were filed as part of other cases (i.e., Exs. G, H, and I) and were created outside the claims period at issue here (Exs. G and I), these declarations are nonetheless all relatively recent evidence of Omnicare's nationwide misclassification scheme – a scheme that the totality of the evidence submitted herein overwhelmingly indicates is enduring nationwide.

courier company that Omnicare contracts with. *Id*. at ¶¶ 4-11. During the course of Mr.

Messick's tenure, Omnicare has utilized 4 different courier companies that he has been required

to contract with in order to continue working for Omnicare. *Id*. at ¶ 9. Nevertheless, he

explained that:

> throughout [his] tenure as a delivery driver [he has]: (1) been required to drive [his]
> personal vehicle in order to perform the delivery work on behalf of Omnicare; (2) not
> been reimbursed for gasoline or any vehicle-related expenses; (3) never received an
> overtime premium for hours worked in excess of 40 (although [his] current route does not
> require [him] to work more than 40 hours per week); and (4) always made deliveries to
> Omnicare's customers and clients.

*Id*. at ¶ 11. Mr. Messick's Omnicare experience is the same as those of Plaintiff and other

Omnicare delivery drivers across the country. *See* Hager Decl. (Ex. E) at ¶ 13; Abdi Decl. (Ex.

G) at ¶¶ 4, 10, 12, 19, 21 (a delivery driver making pharmaceutical deliveries for Omnicare in

Maine via a subcontractor was required to use his personal vehicle, was never reimbursed for the

cost of using his vehicle, and was never paid overtime despite frequently working more than 40

hours); Davis Decl (Ex. H) at ¶¶ 1, 5-6); Kepford Decl. (Ex. I) at ¶¶ 3, 5-8. All delivery drivers

are based out of an Omnicare hub pharmacy where they must pickup tote bags with

pharmaceutical products to deliver to Omnicare's customers in the same or a similar manner. *See*

Hager Decl. (Ex. E) at ¶ 14; Messick Decl. (Ex. F) ¶ at 11. Delivery drivers must ensure

confirmation of deliveries in real-time and are instructed to obtain signatures from the nurses at

the senior facilities where they make deliveries. Hager Decl. (Ex. E) at ¶ 27; Messick Decl. (Ex.

F) ¶ at 25. Delivery drivers are also required to comply with Omnicare's recordkeeping policies

and to return their work-related paperwork to Omnicare's facilities after completing their

deliveries. Hager Decl. (Ex. E) at ¶ 28; Messick Decl. (Ex. F) ¶ at 26. In response to the

complaint in *Davis,* Omnicare answered "that the nature of the pharmaceutical products involved

in [delivery work] requires that the products be secure and that [its contractors] obtain proof of

chain of custody, including paperwork, indicating the proper delivery of the pharmaceutical products." *Davis*, *supra*, Dkt. 4 (Ex. J) at 30 ¶ (b).

While Plaintiff and delivery drivers in different geographic regions may be required to contract with different courier companies, they similarly experience minimum wage violations as a result of Omnicare's misclassification scheme whereby drivers are forced to use their personal vehicles to perform delivery work without adequate compensation. For example, although the manner in which Ms. Hager and Mr. Messick were paid varies slightly, they received a similar amount of compensation to perform their standard fixed routes. Specifically, Ms. Hager was paid approximately $45 to $50 dollars per day to drive a route of approximately 100 miles. Hager Decl. (Ex. E) at ¶¶ 32-33. As such, she was paid approximately 45 to 50 cents per mile. Similarly, Mr. Messick is currently paid 45 cents per mile (previously 50 cents) to perform his assigned fixed routes. Messick Decl. (Ex. F) at ¶¶ 29-31.  In both cases, Plaintiff and Mr. Messick are paid far below the minimum wage when factoring in the unreimbursed gasoline and vehicle-related expenses. *See also* Decl. of Kepford (Ex. I) at ¶ 3, 6-7 (declaring that he delivered pharmaceutical products from designated Omnicare warehouses in Colorado and that in some weeks he "did not receive the minimum wage because [he] worked so many hours for such little pay, especially considering that he had to pay for [his] own gas."). As Plaintiff declared, Omnicare delivery drivers frequently vent about unreimbursed expenses such as gas, vehicle maintenance, frequent oil changes, and wear-and-tear on their personal vehicles due to the many miles they are required to drive for Omnicare. Hager Decl. (Ex. E) at ¶ 34. It is clear that delivery drivers are frequently paid below the minimum wage because of these unreimbursed expenses.[12]

---

[12]    As Mr. Messick declared, he is aware that in recent years the IRS vehicle reimbursement rate was approximately 58 cents per mile.  Messick Decl. (Ex. F) at ¶ 32.

Plaintiff and the putative collective members' work is inextricably tied to the work of Omnicare's pharmacists.  As such, the delivery drivers cannot depart to make their assigned deliveries until pharmacists have finished preparing the specific tote bags assigned to the specific delivery driver (corresponding to their assigned routes). Hager Decl. (Ex. E) at ¶¶ 24-26; Messick Decl. (Ex. F) ¶¶ at 21-23.   As a result, delivery drivers are often required to spend time at Omnicare's facilities waiting for Omnicare pharmacists to release their assigned tote bags. *Id*. In addition to the normal routes assigned to delivery drivers, delivery drivers are often required to make "stat" runs (i.e., high priority medicine deliveries that are to be delivered on an as-needed basis) to Omnicare's customers. Hager Decl. (Ex. E) at ¶¶ 29-30; Messick Decl. (Ex. F) ¶¶ at 27-28.

C.      **Omnicare Inc. Monitors and Controls Delivery Driver Services (Including Costs) Nationwide and Substantially Standardizes Delivery Driver Work Across Pharmacies**

Theodore Johnson was a recent employee of Omnicare in Ohio (the state where Omnicare is headquartered) whose chief duties involved analyzing delivery information as "a member of [Omnicare's] analytics team." Johnson Dep. Excerpts (Ex. D) at 8. His analytics team duties required him to analyze the delivery of pharmaceuticals to long-term care facilities, hospices, and group homes in 47 states across the country. *Id*. at 9, 17. However, prior to joining the analytics team, he worked as a driver, delivery supervisor, and regional manager.  *Id*. at 9. At the beginning of Mr. Johnson's decades-long tenure with Omnicare, he worked out of Omnicare's Englewood, Ohio pharmacy as a delivery driver and he was classified as an employee receiving a regular hourly wage, overtime when he worked in excess of 40 hours per week, and he was provided a company vehicle to make deliveries for Omnicare.  *Id*. at 9-14. According to Mr. Johnson's Linkedin profile, he worked for Omnicare until September 2019 and his job was to "work with courier companies in the central part of the United States to insure

they are performing appropriately at the lowest cost possible," to "[h]elp develop new techniques to improve the quality and timeliness of the delivery process" and to "[c]oordinate the processes in the pharmacies so they align with the courier's needs."[13] *See* Ex. 4 to Shuford Decl. (Ex. A) at 2.

Recently, Omnicare advertised a nationwide job posting for an "Advisor Courier Delivery and Logistics Management" position or an "Advisor Courier" position similar in nature to Mr. Johnson's description of his previous role with Omnicare. *See* Ex. 2 to Shuford Decl. (Ex. A).  In this job posting, Omnicare referred to delivery drivers "as the 'face of the company'" and sought to hire a manager "responsible for creating, driving and supporting the implementation of new processes and optimizing both delivery cost and customer experience." *Id*. at 1. Indeed, the posting further explains that the "position will manage process updates as well as new customer facing techniques, properly equip field personnel to implement changes, and work to continuously improve." *Id*. The Advisor Delivery position "partners cross-functionally with numerous groups throughout Omnicare but most crucially with logistics and procurement." *Id*. The Advisor Courier Delivery job posting indicates that this Omnicare manager notably can work anywhere "within 40 miles of an Omnicare Hub Pharmacy."  *Id*.  **Some of the relevant duties include: "Optimizing a courier network," "Working directly with couriers in onboarding, training, etc.," and "Managing courier performance."** *Id*. at 2 (emphasis added).

Omnicare's recent Advisor Delivery position job posting reflects Omnicare's nationwide

---

[13]     In his deposition, he explained that he was part of a "task force" that analyzed Omnicare's delivery process and even after this so called-task force disbanded, he continued to advise on Omnicare's delivery processes nationwide. Ex. D at 17-18. (Testifying that he "started advising pretty much the whole country after a while" and that Omnicare "is in 47 states."). In his role at Omnicare, Mr. Johnson helped gather data for courier company Requests for Proposals ("RFP"). *Id*. at 29.  In this capacity, he used a program known as "Microsoft MapPoint" to track which delivery routes were the "fastest." *Id*. Indeed, he expressly clarified that in preparing data for the RFP Omnicare would look for the "fastest" "[n]ot shortest" route. *Id*.

practice of contracting with courier companies while simultaneously exerting control over delivery drivers' work.  Indeed, an Omnicare manager at one of its West Virginia pharmacies has explained in deposition testimony that the routes performed by delivery drivers "are monitored daily, and that's a Corporate monitoring process." Lockard Dep. Excerpts (Ex. K) at 83.

## III.   ARGUMENT

### A.   The Standard for Conditional Certification is "Fairly Lenient" and Requires Only a "Modest Factual Showing" That Plaintiffs and Potential Opt-Ins are Similarly Situated.

When considering motions for conditional certification, courts in the Fourth Circuit use a "two-step process" to determine whether a proposed group of plaintiffs is "similarly situated" and therefore qualified to proceed as a conditional collective action. *See Steinberg v. TQ Logistics*, No. 0:10-cv-2507-JFA, 2011 WL 1335191, at *1 (D.S.C. Apr. 7, 2011) (collecting cases). The first step in this approach is the "notice stage," or "conditional certification," stage. *Butler*, 876 F. Supp. 2d. at 566-567; *Young*, 2017 WL 3445562, at *2. At the conditional certification stage, the only issue before the Court is whether Plaintiffs have made a "modest factual showing" that they and others "were victims of a common policy, scheme, or plan that violated the law." *Butler* at 566.

"[A] plaintiff moves for conditional certification to permit notice to similarly situated employees prior to discovery." *MacGregor v. Farmers Ins. Exch.,* No. 2:10–CV–03088, 2012 WL 2974679, at *1 (D.S.C., July 20, 2012); *see also Young*, 2017 WL 3445562, at *2.[14] As such, the standard at this first stage is "fairly lenient." *Steinberg*, 2011 WL 1335191, at *1. The Court

---

[14]    Courts have often rebuked defendants who argue that conditional certification can only occur after discovery. *See, e.g., Nieto v. Pizzati Enterprises, Inc.,* No. 16-5352 2017, WL 1153375, at *7 (E.D. La. Mar. 27, 2017) ("[d]efendants have not shown that additional discovery is necessary at this early stage of the litigation…"); *Blount v. U.S. Sec. Assocs.*, 945 F. Supp. 2d 88, 97 (D.D.C. 2013); *Brasfield v. Source Broadband Serv., LLC,* No. 2:08-2092-JPM/dkv, 2008 WL 2697261, at *2 (W.D. Tenn. June 3, 2008) ("The leniency of Plaintiff's burden at this first procedural stage renders even initial discovery unnecessary.").

need only "[examine] the pleadings and affidavits of the proposed collective action" to make a preliminary finding as to whether Plaintiff and opt-ins are similarly situated and notice should issue. *Id*. Courts regularly make conditional certification determinations "based only on the pleadings and any affidavits which have been submitted." *Prescott v. Prudential Ins. Co.,* 729 F. Supp. 2d 357, 364 (D. Me. 2010) (quoting *Hipp v. Liberty Nat'l Life. Ins. Co.*, 252 F.3d 1208, 1218 (11th Cir. 2001)).

Indeed, courts often grant conditional certification based only on a single declaration[15] or based on a small number of affidavits. *See, e.g., Bass v. PJComn Acquisition Corp.*, No. 09–cv–01614–REB–MEH, 2010 WL 3720217 (D. Colo. Sept. 15, 2010) ("The declarations of the two named plaintiffs provide support…for the contention that the defendants' policies, generally applicable to delivery drivers, result in the payment of wages at a rate lower than that required by the FLSA.").

### B.   Plaintiffs Have Made the Requisite Showing that a Collective of Similarly Situated Individuals Exists Nationwide

Plaintiffs have made the requisite "modest factual showing" that they and other delivery drivers "were victims of a common policy, scheme, or plan that violated the law." *See Butler*, 876 F. Supp. 2d. at 576.

Plaintiff and putative collective members have independently made Declarations that converge on a common scheme or plan utilized by Omnicare to avoid paying its delivery drivers in accordance with the FLSA. For example:

- Regardless of the intermediary courier company delivery drivers are required to contract with, delivery drivers working for Omnicare are not paid overtime for any hours worked

---

[15]     *See, e.g., Williams v. ezStorage Corp.,* No. RDB–10–3335, 2011 WL 1539941, at *3 (D. Md. 2011) (rejecting self-storage company's argument that a single affidavit was insufficient to support certification and certifying a multi-state collective); Butler, 876 F. Supp. 2d at n. 10 (citing *Williams*); *Fang v. Zhuang*, No. 10–CV–1290 (RRM) (JMA), 2010 WL 5261197, at *3 (E.D.N.Y. Dec. 1, 2010) ("[a]lthough plaintiff only corroborates his allegations with his own affidavit, courts . . . have found this adequate for conditional certification").

in excess of 40 or reimbursed for all work-related expenses.

- The nature of delivery drivers' work for Omnicare requires them to drive hundreds if not thousands of miles per week for Omnicare, likely resulting in frequent minimum wage violations where drivers' similarly meager compensation often does not even (or barely) cover their expenses.

- Omnicare dictates drivers' routes, numerous personnel requirements, maintains authority to terminate drivers, and drivers are economically dependent on Omnicare.

Indeed, while Omnicare disclaims employment liability for its drivers, it mandates personnel policies (e.g., pre-hiring and training requirements), monitors and standardizes their work, actively works to reduce costs associated with delivery drivers, prohibits delivery drivers from charging Omnicare's customers directly for its services or from otherwise making a profit, and expressly reserves the contractual authority to terminate or substitute delivery drivers for failing to meet any of its standards. *See* Section I, *supra*.

### i.      Nationwide Conditional Certification Is Plainly Appropriate Under the Facts of this Case

Omnicare has a uniform policy of treating delivery drivers as non-employee independent contractors and failing to comply with wage and hour law. This common policy of misclassification – and resultant wage violations – provides sufficient basis for granting conditional certification. *See Butler*, 876 F. Supp. 2d at 574 (certifying a collective of satellite TV technicians who made the "'minimal evidentiary showing' that a common policy or scheme to violate the FLSA existed…"); *LaFleur v. Dollar Tree Stores, Inc.*, 30 F. Supp. 3d 463, 469 (E.D. Va. 2014) (denying defendant's motion to decertify a nationwide collective where discovery produced "additional evidence of a nationwide corporate practice that allegedly violates the FLSA, and has been applied to all opt-in plaintiffs in a similar manner.")

Moreover, Plaintiff has clearly made the required modest factual showing that Omnicare's policy of treating its delivery drivers as non-employees and disclaiming employment liability associated with drivers' work for Omnicare impacts Omnicare delivery drivers in

materially identical ways across the country. In *Hart v. Barbeque Integrated, Inc.,* 299 F. Supp. 3d 762, 771 (D.S.C. 2017), "[t]he Court conclude[d] that conditional certification of a nationwide class of servers and bartenders [was] warranted" where the Defendant had a policy of requiring workers to perform non-tipped side work. While the Court noted that "requiring side work does not necessarily violate the FLSA…Plaintiff has made a sufficient showing that [Defendant's] nationwide side work policy potentially caused FLSA violations for all [of Defendant's] servers and bartenders." *Id*. Similarly, here, while Omnicare may erroneously argue that its nationwide misclassification scheme is insufficient to warrant notice, it is apparent that where Omnicare has disclaimed responsibility for its statutory obligations under the FLSA, there are unquestionably drivers across the country who are not being paid overtime premiums for hours worked in excess of 40 hours per week and who are not being paid the minimum wage for all hours worked. That FLSA violations are the certain byproduct of Omnicare's nationwide misclassification scheme is especially true where every piece of evidence (indeed, Omnicare's master Courier Agreement itself) suggests that Omnicare does not reimburse its delivery drivers for vehicle expenses or maintenance – a practice that almost invariably results in FLSA kickback violations where delivery drivers are required to drive hundreds or thousands of miles per week for Omnicare.[16]  *See Hatmaker v. PJ Ohio, LLC*, No. 3:17-CV-146, 2019 WL 5725043, at *5 (S.D. Ohio Nov. 5, 2019) (finding that the IRS reimbursement rate applies where an employer

---

[16]      *See, e.g.*, *Zellagui v. MCD Pizza, Inc.*, 59 F. Supp. 3d 712, 716 (E.D. Pa. 2014) ("When minimum wage law requires an employer to reimburse an employee for using the employee's vehicle for the employer's benefit, the employer should reimburse the employee at the IRS per mile rate or keep detailed records of the employees' expenses to justify another reimbursement rate." *See* Department of Labor Field Operations Handbook, § 30c15(a) (issued June 30, 2000) (for minimum wage purposes, employer may either reimburse employees who drive a personal vehicle for business use at the IRS rate or keep accurate, contemporaneous expense records and reimburse the employee accordingly).");  *See also*, *Benton v. Deli Mgmt., Inc.*, No. 1:17-CV-296-WSD, 2017 WL 10574355, at *6 (N.D. Ga. Dec. 18, 2017) (conditional certification granted where drivers were not paid the IRS reimbursement rate and alleged resultant minimum wage violations).

does not reimburse its employees actual delivery costs and that where "under-reimbursement

puts [delivery] drivers at risk to have their wage rights violated under the FLSA's anti-kickback

regulation.  29 C.F.R. § 531.35."). *See also Falcon v. Starbucks Corp.*, 580 F. Supp. 2d 528,

539–40 (S.D. Tex. 2008) (denying motion to decertify[17] a nationwide FLSA collective against

Starbucks where Starbucks argued that too many differences existed at its locations across the

country).

In sum, notwithstanding any arguments by Omnicare to the contrary, Plaintiff has

provided a copious amount of evidence at this early stage to warrant conditional certification.

**C.      Though Not Required for Conditional Certification, Plaintiff Has Put Forth
         Sufficient Evidence to Make a More than Plausible Claim that Putative
         Collective Members Are Jointly Employed by Defendants**

At this time, the question presented is whether Plaintiff and the other delivery drivers

who worked or work for Omnicare are similarly situated (i.e., are classified as independent

contractors, perform similar job duties, and are likely victims of similar FLSA violations by

virtue of Omnicare's misclassification scheme and its failure to pay overtime or reimburse

delivery drivers for all work-related expenses). It should be noted that Defendant may argue that

conditional certification is not appropriate based on the joint employer defense; however, the

determination of joint employer is not considered in determining whether Plaintiff has met the

lenient burden at the notice stage.[18]

Indeed, as this Court is aware, Omnicare has previously been found to be a statutory joint

---

[17]      And at this "second-stage" of the FLSA's certification process, courts may apply a more
demanding standard of proof that putative class members are similarly situated.

[18]      *See Young*, 2017 WL 3445562, at *3 ("Whether or not Omnicare and Act Fast are joint
employers under the FLSA or accompanying federal regulations is not relevant concerning
conditional class certification."); *Krueger v. New York Tel. Co.,* C.A. No. 93 CIV. 0178(LMM),
1993 WL 276058, *2 (S.D.N.Y. July 21, 1992) ("Defendants argue that this case is not
appropriate for adjudication as a collective action because Plaintiffs cannot demonstrate the
requisite employer/employee relationship. This is a merits-based argument, and courts are not to
engage in merits-based analysis at the notice stage of a collective action.").

employer of its delivery drivers in West Virginia.  *See Young*, 2018 WL 279996, at *8 ("Based on the entirety of the undisputed facts before the Court, and viewing each party's motion in the light most favorable to the non-moving party, no genuine issue of material fact exists as to Omnicare's joint control over the Plaintiffs' work.").[19]

### D.    Plaintiff's Proposed Notice is Proper

Plaintiff asks the Court to issue notice (including an opt-in form), in the form attached here as Ex. L, to all individuals who made deliveries for Omnicare nationwide and were classified as independent contractors from June 28, 2016 to the present.  Notice serves the FLSA's broad and remedial purpose, *see Hoffman-LaRoche*, 493 U.S. at 173, and the form and content of a section 216(b) notice should maximize participation. *See Prescott*, 729 F. Supp. 2d at 370 ("[J]ustice is best served by notice reaching the largest number of potential plaintiffs."). In order to facilitate notice, the court should also order Defendant to produce to Plaintiff a list of the potential opt-in plaintiffs' names, last-known or obtainable mailing addresses, email addresses, telephone numbers, work locations and courier company contact information, and dates of employment. Courts routinely require this kind of information when granting conditional certification.[20]  To effectuate the FLSA's broad-remedial purpose, the Court should allow Plaintiff to then send notice to class members by email, text message, and U.S. Mail.[21] The

---

[19]     Notably, in reaching this decision the Court relied heavily on Omnicare's Agreement with Act Fast – an agreement that reflected Omnicare's control over the work performed by delivery drivers.  Here, Plaintiff has demonstrated that Omnicare's misclassification scheme extends far beyond West Virginia, but the same underlying common evidence will ultimately permit Plaintiff and the putative class to prevail on the question of employment liability, and any argument to the contrary by Defendants is simply premature at the conditional certification stage.

[20]     *See, e.g., Curtis v. Scholarship Storage Inc.*, No. 2:14-CV-303-NT, 2015 WL 1241365, at *5 (D. Me. Mar. 18, 2015) (granting "Plaintiffs' request for the names, addresses, telephone numbers, and email addresses of all potential collective action members."); *O'Connor v. Oakhurst Dairy*, 2015 WL 2452678, at *4 (D. Me. May 22, 2015) (granting "Plaintiffs request that their counsel be provided with the names, addresses, e-mail addresses, and telephone numbers of all potential collective action members within fourteen days").

[21]     *See also Calvillo v. Bull Rogers, Inc.*, 267 F. Supp. 3d 1307, 1315 (D.N.M. July 25, 2017) ("Courts have recognized that notice by email and text is reasonable in today's mobile

Court should also authorize Plaintiffs to mail, email, and text a reminder to all individuals who have not yet opted-in to this matter within 45 days of the first notice mailing.[22]  Finally, Plaintiff proposes that the potential opt-in plaintiffs who desire to participate in this lawsuit be provided 90 days from the date of mailing in which to file their consent forms. This request is consistent with established practice under the FLSA.[23]

## IV.    CONCLUSION

Plaintiff has amply shown that notice is appropriate at this stage of the case.  Plaintiff respectfully requests that the Court enter an Order in the form attached hereto as Ex. M.

Dated: January 10, 2020                                Respectfully submitted,

Cathy Hager,
on behalf of herself and all
others similarly situated,

By her attorneys,

/s/   Thomas R. Goodwin
Thomas R. Goodwin (WV Bar No. 1435)
Susan C. Wittemeier (WV Bar No. 4104)
W. Jeffrey Vollmer (WV Bar No. 10277)
Goodwin & Goodwin, LLP
300 Summers Street, Suite 1500
Charleston, WV 25301
(304) 346-7000
trg@goodwingoodwin.com
scw@goodwingoodwin.com
wjv@goodwingoodwin.com

---

society and that these methods of communication may offer a more reliable means of reaching an individual even if that individual is away from home or has moved."); *Irvine v. Destination Wild Dunes Management, Inc.*, 132 F. Supp. 3d 707 (D.S.C. Sept. 14, 2015) ("The request that notice be distributed via direct mail, email and text messaging appears eminently reasonable to the Court.")

[22]     *See, e.g., Clark v. Williamson*, 2018 WL 1626305, at *7 (M.D.N.C. Mar. 30, 2018); *Walters v. Buffets, Inc.*, 2016 WL 4203851, *1 (D.S.C. March 1, 2016) (permitting the issuances of reminder notices because "[t]his court specifically finds compelling the FLSA's intentions to inform as many plaintiffs as possible of their right to opt into a collective action like the one here.").

[23]     *See Butler*, 876 F. Supp. 2d at 575 ("[N]umerous courts around the country have authorized ninety-day opt-in periods for collective actions.") (citations omitted).

Harold L. Lichten, admitted *pro hac vice*
Zachary L. Rubin, admitted *pro hac vice*
LICHTEN & LISS-RIORDAN, P.C.
729 Boylston St., Suite 2000
Boston, MA  02116
(617) 994-5800
hlichten@llrlaw.com
zrubin@llrlaw.com

## <u>CERTIFICATE OF SERVICE</u>

I certify that a copy of the foregoing **PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HER MOTION FOR CONDITIONAL CERTIFICATION OF COLLECTIVE ACTION AND COURT-SUPERVISED NOTICE PURSUANT TO 29 U.S.C. § 216(b)** was served via  CM/ECF system on January 10, 2020 to the following:

Nancy E. Rafuse, Esq.
nrafuse@seyfarth.com
James J. Swartz, Jr. Esq.
jswartz@seyfarth.com
J. Stanton Hill, Esq.
jshill@seyfarth.com
Andrew M. McKinley, Esq.
amckinley@seyfarth.com
Seyfarth Shaw LLP
*Counsel for Defendants*

/s/ <u>Thomas R. Goodwin</u>

Counsel for Plaintiff