## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF WEST VIRGINIA
## AT BECKLEY

| | |
|---|---|
| **CATHY L. HAGER, on behalf of herself and all others similarly situated,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 5:19-cv-00484** |
| **OMNICARE, INC.,** | |
| **Defendant.** | |

## MEMORANDUM OPINION AND ORDER
## <u>GRANTING JOINT MOTION FOR COURT APPROVAL OF SETTLEMENT</u>

Pending before the Court is the parties' Joint Motion for Court Approval of Settlement. On November 4, 2021, the Court held a status conference in this matter, during which certain argument was provided by counsel for both parties in further support of the joint motion.  For the reasons set forth below, the Court **GRANTS** the joint motion, approves the settlement, and dismisses this action with prejudice (while retaining jurisdiction to enforce the settlement agreement if necessary).

## I.  Case Background

This case was filed on June 28, 2019, seeking unpaid overtime and minimum wages under the Fair Labor Standards Act, 28 U.S.C. § 201, *et seq.*, ("FLSA") for a group of delivery drivers that delivered pharmaceutical and related medical items to health care entities across the United States.  This case has been heavily litigated throughout the last two years.  Omnicare moved to dismiss the complaint, and, after extensive briefing by both parties, the Court denied without prejudice Omnicare's motion.  (*See* ECF Nos. 9, 10, 17, 18, and 26.)  Plaintiff moved for conditional certification of this case on a nationwide basis, and, after further extensive briefing by

both parties (including a cross-motion to strike notice of consent filed by Omnicare), the Court

granted Plaintiffs' motion and certified the following nationwide collective:

> All current and former delivery drivers classified as independent contractors who
> delivered pharmaceutical products for Omnicare to Omnicare's customers, clients,
> or business partners and received their last paycheck in connection with this
> delivery work on or after September 29, 2017.

(*See* ECF Nos. 32, 33, 35, 36, 37, 39, 40, 41, 44, and 45.)  Following conditional certification, and

pursuant to the Court's order, the parties worked cooperatively to obtain contact information from

third parties for potential collective members, and to effect notice upon such putative collective

members.  (*See generally* ECF Nos. 46-103.)  During that time, Omnicare engaged in extensive

efforts to obtain such contact information from third-party courier companies, including subpoenas

and certain motions practice, and Plaintiffs' counsel retained the services of a third-party

administrator to effect notice to putative collective members.  (*Id.*).  During this process, the parties

filed multiple joint status reports with the Court regarding their progress, and Plaintiffs served

extensive written discovery upon Omnicare (*See* ECF Nos. 52, 64, 73, 81, 83, and 90.)  As a result

of these efforts, 1,231 delivery drivers from across the country affirmatively opted-in and joined

this case.

Upon conclusion of the notice and opt-in process, the parties agreed to attempt to resolve

this case through mediation.  (*See* ECF No. 104.)  According to the parties, the mediation proposal

stemmed from the unique history of this litigation:  this case is the third lawsuit pursued by

Plaintiffs' counsel against Omnicare for alleged FLSA violations arising from the delivery of

Omnicare's pharmaceutical products to its customers.  The first such case, *Young v. Act Fast

Delivery of West Virginia, Inc.*, *et al.*, Case No. 5:16-cv-09788, was filed in this Court almost five

years ago, on October 17, 2016.  The second such case, *Davis v. Omnicare, Inc.*, Case No. 5:18-

cv-00142-REW-MAS, was filed in the United States District Court for the Eastern District of

Kentucky, Lexington Division, on February 19, 2018.  Both of those prior cases were extremely contentious and resolved via settlement only following protracted and expensive litigation.

According to the parties, these prior cases gave counsel for both sides a deep and nuanced understanding of all of the factual and legal issues surrounding Plaintiffs' claims and Omnicare's defenses.  This understanding permitted the parties to engage in mediation at an earlier stage in the instant case, and to resolve this case in a fair and equitable manner.  In order to engage in a productive mediation, the parties agreed that Omnicare would produce voluminous electronic data (the ASN-POD Reports that were utilized by Plaintiffs' counsel in *Young* and *Davis* to calculate alleged damages) for collective members in the instant litigation.  Plaintiffs' counsel retained the services of the same data analysis expert that they used in the *Young* and *Davis* cases to organize and analyze the ASN-POD Reports and convert the reports into an estimated calculation of damages.  The production of the ASN-POD Reports and the attendant analysis took place over the course of three months preceding the mediation.

Following these extensive preparations, the parties attended a video-conferenced mediation on August 31, 2021, with Hunter Hughes, a nationally-renowned mediator in complex litigation, including wage and hour collective litigation.  The mediation lasted all day and was conducted entirely at arms-length, but the parties were unable to resolve the case during the August 31, 2021 session.  In fact, according to the parties, the day's session ended with both sides significantly apart in their respective bargaining positions.  The following day, on September 1, Mr. Hughes proposed a "mediator's number" at which he thought the case could potentially be settled.  Two days later, on September 3, Mr. Hughes informed the parties that both sides had accepted his proposed number and the case was settled pending approval of this Court.

As described in more detail below, the proposed settlement provides a significant and highly favorable recovery for the Plaintiff delivery drivers in this case. The parties have jointly asked the Court to review and approve all terms of the proposed agreement so that the settlement can be effectuated, payments can be made to the drivers, and this case can be resolved and dismissed. An executed and complete copy of the parties' Settlement Agreement ("Agreement") was attached as Exhibit A to the joint motion filed with the Court. (ECF No. 117, Ex. A.) Appendix A to the Settlement Agreement is a list containing the names of the 1,231 drivers who have opted-in, joined this case, and are participating in this settlement.

## II.  Summary of Settlement Agreement

The parties have agreed to settle this case under the following material terms, among others that are set forth and explained in more detail in the Agreement. Omnicare has agreed to pay a total of eleven million, nine hundred thousand dollars ($11,900,000.00) to resolve this litigation (plus its one-half share of the costs and fees of the Claims Administrator to be retained by the parties to administer this settlement). Agreement at Art. 3 (A), (B)(4). In exchange, Named Plaintiff Hager and all opt-in Plaintiffs (collectively, "Plaintiffs") in the certified collective will release all wage and hour claims (state and federal) that were asserted or could have been asserted in this litigation against Omnicare. *Id.* at Art. 8. After all proposed fees and costs are paid out, the Plaintiffs will share a net settlement fund of seven million, nine hundred and thirty-three thousand, three hundred and thirty-four dollars ($7,933,334.00) (less the proposed incentive Payment to named Plaintiff Hager as set forth below, and less Plaintiffs' one-half share of the fees and expenses of the Claims Administrator selected to administer the settlement distribution described herein). *Id.* at Art. 3 (B)(1)(a). This money will be distributed to each individual opt-in Plaintiff on a *pro rata* basis determined by each Plaintiff's respective percentage share of the total

damages calculations made by Plaintiffs' expert data analyst and Plaintiffs' counsel using Omnicare's ASN-POD Reports.  *Id.* at Art. 3 (B)(1)(c).  The *pro-rata* distribution will be made based on the number of weeks worked by each Plaintiff.[1]  *Id.* at Art. 3 (B)(1)(d).  The parties have agreed to and ask the Court to approve a reasonable incentive payment of $10,000 to the lead Plaintiff Cathy Hager.  *Id.*  The parties have agreed to and ask the Court to approve the allocation of three million, nine hundred and sixty-six thousand, six hundred and sixty-seven dollars ($3,966,666.00) of the gross settlement amount to Plaintiffs' counsel as attorneys' fees, litigation costs, and expenses.  *Id.*  This amount (which includes all fees and costs for the litigation) equals one-third of the total recovery.  The parties agree, and submit to the Court, that this settlement is an extremely fair resolution of disputed claims.  Omnicare specifically denies and does not admit liability under this settlement agreement.  *Id.* at Art. 2 (B), Art. 1.  Two hundred thousand dollars ($200,000.00) of the $7,933,334.00 net portion of the settlement shall be held by the Claims Administrator in trust as an "Allocation Correction Set-Aside" amount for a defined period of time to correct and resolve any disputes by Plaintiffs as to the amount paid to them in connection with this Settlement.  *Id.* at Art. 3 (B).  Any settlement checks that have not been cashed within one full year under the terms of the Settlement Agreement (including any amounts remaining in the Allocation Correction Set-Aside) shall be redistributed to all other eligible Plaintiffs on the same *pro-rata* percentage basis used for the initial payments.  *Id.*  If, after 120 days from the second

---

[1]     Attached as Exhibit B to the joint motion is the proposed distribution chart prepared by Plaintiffs' counsel showing the estimated distribution shares to the opt-ins.  The names of individual Plaintiffs have been omitted from this chart to protect their respective identities and privacy regarding the distribution amounts they are likely to receive.  This distribution chart shows that the average estimated payout will be more than $6,000 per person.

distribution to Plaintiffs, there remain uncashed checks, such unconsummated payments and any unclaimed funds shall be donated *cy-pres* to Legal Aid of West Virginia.

The parties submit that the terms of the Agreement are fair and reasonable and should be approved by this Court.  The parties ask the Court to issue an Order: (1) granting this Motion and approving the parties' settlement as set forth in the Agreement; (2) approving Omnicare's disbursement of $11,900,000.00 to a Qualified Settlement Fund to be established by a Claims Administrator to be selected by the parties; (3) approving an incentive payment of $10,000 to Named Plaintiff Cathy Hager; (4) authorizing distribution of the settlement checks by the Claims Administrator to the FLSA Collective Members on the *pro-rata* basis determined by the parties; (5) approving the disbursement by the Claims Administrator of attorneys' fees and costs of $3,966,666.00 to Plaintiffs' counsel; and (6) granting final approval of the Settlement and dismissing this case with prejudice in accordance with the terms of the Agreement.

### III.  Legal Standard

Courts of the Southern District of West Virginia have adopted and developed a widely-accepted framework for reviewing, analyzing, and approving proposed settlements under the Fair Labor Standards Act ("FLSA").  This Court reviewed and applied this framework when it approved the settlement in *Young*.  *See Young v. Act Fast Delivery of W. Va., Inc.*, No. 5:16-cv-09788, 2020 U.S. Dist. LEXIS 148989, 2020 WL 4805036 (S.D. W. Va. August 18, 2020). "Courts should approve joint settlement agreements of FLSA claims 'if a proposed settlement reflects a reasonable compromise over contested issues.'" *Id.*, 2020 U.S. Dist. LEXIS 148989 at *3; (quoting *Senior v. Robert Newlin Airport, Inc.*, No. 3:18-1382, 2019 WL 4267488, 2019 U.S. Dist. LEXIS 152843, at *4-5 (S.D. W. Va. Sept. 9, 2019) (quoting *Lomascolo v. Parsons Brinckerhoff, Inc.*, No. 1:08cv1310, 2009 U.S. Dist. LEXIS 89136, 2009 WL 3094955, at *8 (E.D.

Va. Sept. 28, 2009))).  "This approval process embraces a relatively forgiving standard that reflects the uncertainty of the litigation process and legal and factual disagreements" between the parties. *Id*. at *4 (citations and quotation marks omitted).  "Simply put, 'where there is an assurance of an adversarial context and where an employee is represented by an attorney who can protect his rights under the statute, a settlement will be approved.'" *Id.* at *3 (quoting *Brockman v. Keystone Newport News, LLC*, No. 4:15-CV-74, 2018 U.S. Dist. LEXIS 176255, 2018 WL 4956514, at *2 (E.D. Va. Oct. 12, 2018)).

"Because the Court of Appeals for the Fourth Circuit has not yet had occasion to endorse a standard for approving FLSA settlements, 'district courts in this circuit typically employ the considerations set forth by the Eleventh Circuit in *Lynn's Food Stores*.'" *Id.* at *4-5; *see also Mayhew v. Loved Ones in Home Care, LLC*, No. 2:17-cv-03844, 2020 U.S. Dist. LEXIS 53127, at *4 (S.D. W. Va. March 26, 2020) (quoting *Duprey v. Scotts Co. LLC*, 30 F. Supp. 3d 404, 407-08 (D. Md. 2014)).  Under this approach, "[w]hen employees bring a private action for back wages under the FLSA, and present to the district court a proposed settlement, the district court may enter a stipulated judgment after scrutinizing the settlement for fairness." *Id.* (quoting *Lynn's Food Stores, Inc. v. United States*, 679 F.2d 1350, 1352-53 (11th Cir. 1982)).  In order to be approved,

> [T]he settlement must "reflect a fair and reasonable resolution of a bona fide dispute over FLSA provisions," which includes a finding with regard to (1) whether there are FLSA issues actually in dispute, (2) the fairness and reasonableness of the settlement in light of the relevant factors from Rule 23, and (3) the reasonableness of the attorneys' fees, if included in the agreement.

*Id.* (quoting *Duprey*, 30 F. Supp. 3d at 407-08; citing *Lynn's Food Stores*, 679 F.2d at 1355) (underling in original).  "There is a 'strong presumption in favor of finding a settlement fair' that must be kept in mind in considering the various factors to be reviewed in making the determination

of whether a settlement is fair, adequate and reasonable." *Lomascolo*, 2009 WL 3094955, at *10

(quoting *Camp v. Progressive Corp.,* 2004 WL 2149079, *5 (E.D. La. Sept. 23, 2004)).

Because the claims in this case arise solely under the FLSA, no additional notice is required

to be issued to the collective action members before the settlement may be approved. *E.g.*, *Haskett*

*v. Uber Techs., Inc.*, 780 Fed. Appx. 25, 27 (4th Cir. 2019) ("This action only concerned claims

under the FLSA. Unlike Rule 23, [the FLSA] does not require a district court to notify potential

claimants about a proposed settlement.") (*per curiam*).[2] The collective action members have each

made the affirmative decision to opt-in to this case. (*See* ECF Nos. 1, 34, 71-72, 75-80, 84-89, 91,

93-96, 100-101, 103, 105-115.) Each opt-in form states, in pertinent part:

> I hereby consent, agree, and "opt in" to become a plaintiff herein and to be bound
> by any judgment by the Court or any settlement of this action. . . . My designated
> counsel has authority to make decisions on my behalf concerning the litigation,
> including the method and manner of conducting this litigation and entering into
> settlement agreements.

*Id.* Each opt-in form thus reflects each collective action members' respective consent to be

represented by Plaintiffs' counsel, including for purposes of settlement negotiations (no opt-in

form designated any attorney other than Plaintiffs' counsel as "designated counsel"); each

---

[2]     The standard for settlement approval under the FLSA is much less rigorous than
the standard under Fed. R. Civ. P. 23, because Rule 23 settlements extinguish the claims of non-
participating class members. *See Osman v. Grube, Inc.*, 2018 WL 2095172, at *2 (N.D. Ohio May
4, 2018) ("A one-step settlement approval process in FLSA collective actions is appropriate.");
*Knox v. Jones Group*, 2017 WL 3834929, at *2 (S.D. Ind. Aug. 31, 2017) (same); *Briggs v. PNC
Fin. Services Group, Inc.*, 2016 WL 7018566, at *1 (N.D. Ill. Nov. 29, 2016) (collecting cases)
(same); *Jones v. Agilysys, Inc.*, 2014 WL 108420, at *4 (N.D. Cal. Jan. 10, 2014) ("Since Rule 23
does not apply to FLSA actions, there is no corresponding requirement that the Court must conduct
a hearing to confer final approval of a FLSA settlement."). "Because the failure to opt in to an
FLSA lawsuit does not prevent potential members of the collective from bringing their own suits
in the future, FLSA collective actions do not implicate the same due process concerns as do Rule
23 actions." *Knox*, 2017 WL 3834929, at *2 (citing *Woods v. N.Y. Life Ins. Co.*, 686 F.2d 578,
579-80 (7th Cir. 1982)). Such Rule 23 concerns are not presented here, because Plaintiffs' claims
arise solely under the FLSA.

members' consent to be bound by any settlement agreement reached in this case; and each collective members' consent to be bound by any judgment of the Court in this case. *Id.*; *see also Haskett*, 780 Fed. Appx. at 27-28 ("Haskett agreed to be bound by the final judgment whether favorable or unfavorable. . . he could have commenced his own lawsuit if he did not join the collective.").

As set forth below, the Court **FINDS** that the settlement in this case satisfies all relevant factors and legal standards for approval and furthers the broad remedial purposes of the FLSA.

### IV.  Bona Fide Dispute

"In deciding whether a bone fide dispute exists as to a defendant's liability under the FLSA, courts examine the pleadings in the case, along with the representations and recitals in the proposed settlement agreement." *Young*, 2020 U.S. Dist. LEXIS 148989 at *5 (quoting *Mayhew*, 2020 WL 1492542, at *5 (quoting *Duprey*, 30 F. Supp. 3d at 408)).  The Court may consider the "factual and legal assertions contained in the parties' Joint Motion for Court Approval of Settlement" and may also discern the existence of a bona fide dispute from the complaint, answer, and other filings in the case. *Robert Newlin Airport*, 2019 U.S. Dist. LEXIS 152843, at *6.

This case is the culmination of five years and three separate lawsuits in which virtually every relevant issue has been heavily disputed and litigated by both sides.  This is particularly true for all issues involving Omnicare's alleged liability under the FLSA.  Plaintiffs have alleged throughout this case that Omnicare violated the FLSA by: (1) acting as a joint employer of the Plaintiff delivery drivers and (2) failing to pay the Plaintiff delivery drivers the minimum and overtime wages to which they were entitled under federal law. *See*, *e.g.*, Complaint, ECF No. 1. Both of these issues (and many others) have been hotly contested in this case.  In its Answer, Omnicare denied all allegations in Plaintiffs' Complaint and asserted twenty-three affirmative

defenses.  ECF No. 28.  Before it even answered the Complaint, Omnicare filed a motion to dismiss and a motion to strike that each raised multiple jurisdictional arguments.  ECF Nos. 9-10; 36-37. Plaintiffs and Omnicare each filed extensive response and reply memoranda regarding each motion.  ECF Nos. 17-18; 40-41.  The Court denied Omnicare's motions.  ECF Nos. 26; 44.

Plaintiff filed and briefed an extensive motion for nationwide conditional certification of the FLSA collective action in this case.  ECF Nos. 32-33.  Omnicare responded and Plaintiff replied.  ECF Nos. 35; 39.  The Court granted Plaintiff's motion and certified the following nationwide FLSA collective:

> All current and former delivery drivers classified as independent contractors who delivered pharmaceutical products for Omnicare to Omnicare's customers, clients, or business partners and received their last paycheck in connection with this delivery work on or after September 29, 2017.

(*See* ECF Nos. 44-45.)  The putative collective involved approximately 9,000 potential delivery drivers; of those, 1,231 have affirmatively opted-in and joined this lawsuit following extensive efforts by the parties to gather the drivers' contact information, issue notice to the drivers via a third-party administrator, and collect and file all opt-in forms that have been received.  *See generally* ECF Nos. 46-115.

Plaintiffs served extensive written discovery upon Omnicare in this case (*See* ECF No. 83). Although Omnicare's formal responses were put on hold pending the planned mediation, significant informal discovery was exchanged before the mediation in the form of the ASN-POD Reports provided by Omnicare to Plaintiffs' counsel.  These ASN-POD Reports contained more than 18 Gigabytes of data spanning nearly 100 million rows of delivery information—a massive volume.  Plaintiffs' counsel retained at considerable expense the same expert they had used previously in the *Young* and *Davis* cases to analyze the ASN-POD Reports.  This expert generated

analytical reports that formed the foundation for both Plaintiffs' mediation strategies and positions and for the proposed estimated distribution plan for the drivers who joined the case.

The parties agree that they were able to engage in this informal exchange of voluminous discovery materials and in the arms-length, contentious mediation in part because of the extensive groundwork—factual and legal—that has been created through the multi-year litigation surrounding the predecessor *Young* and *Davis* cases. This groundwork took massive efforts by counsel for both parties and gave rise to deep familiarity with the factual and legal strengths and weaknesses on both sides of this case. Indeed, Plaintiffs' counsel were only aware of the existence (and importance) of the ASN-POD Reports because of the prior litigation in *Young* and *Davis*.[3]

Additional significant and substantive litigation issues remained in question when this case was mediated, including Defendant's promised motion for decertification of the conditionally certified collective and substantive and procedural dispositive motions. These issues would have been contentiously litigated with great investments of time and resources had this settlement not been achieved. *See, e.g., Young*, 2020 U.S. Dist. LEXIS 148989 at *9-10 ("Moreover, if the proposed settlement were to be denied, the parties contend that expert depositions will be conducted, dispositive motions will be filed, and [a] trial and appeal would take place, leading to even greater expenses.").

In sum, this case has been aggressively litigated for more than two years. It has settled now in part because of the experience and expertise developed by counsel for both sides. The

---

[3]     Additionally, in *Young*, Plaintiffs won certain hard-fought legal rulings which they assert bore critical importance to this case. For example, after extensive discovery in *Young*, Plaintiffs moved for summary judgment on the joint employment issue and on the question of whether Omnicare could avail itself of the independent contractor defense. *Young*, ECF No. 205. Omnicare vigorously disputed the motion and filed a cross-motion for summary judgment. *Id.* at ECF 208; 221. Plaintiffs ultimately prevailed on both motions.

parties contentiously negotiated a difficult settlement over the course of four days with the assistance of one of the premier FLSA mediators in the country.  The first factor in support of settlement approval—the existence of a "bona fide dispute"— is satisfied.

## V.  Fairness and Reasonableness

"The Court next considers whether the settlement agreement is fair and reasonable." *Robert Newlin Airport*, 2019 U.S. Dist. LEXIS 152843, at *8.  In performing this analysis, the Court considers the following factors:

> (1) [T]he extent of discovery that has taken place; (2) the stage of the proceedings, including the complexity, expense and likely duration of the litigation; (3) the absence of fraud or collusion in the settlement; (4) the experience of counsel who have represented the plaintiffs; (5) the probability of plaintiffs' success on the merits and (6) the amount of the settlement in relation to the potential recovery.

*Young*, 2020 U.S. Dist. LEXIS 148989 at *8-9; *Mayhew*, 2020 U.S. Dist. LEXIS 53127, at *6 (quoting *Kirkpatrick v. Cardinal Innovations Healthcare Sols.*, 352 F. Supp. 3d 499, 502-03 (M.D.N.C. 2018)).  Each one of these factors weighs in favor of settlement approval.

*First*, a substantial amount of discovery has taken place.  Plaintiffs served extensive requests for production of documents upon Omnicare in this case (*See* ECF No. 83), and although Omnicare's responses were stayed by agreement pending mediation, Omnicare provided to Plaintiffs a massive amount of electronic data in the form of the ASN-POD Reports.  The production (and subsequent analysis by Plaintiff's counsel and expert) of this voluminous data was the foundation for the mediation and the successful settlement now presented to the Court.  The first factor weighs in favor of finding that the settlement is fair and reasonable.

*Second*, these proceedings have developed and ripened to a stage of litigation over the course of the past two years that permitted an arms-length, fully informed mediation to occur and permitted the instant settlement to be achieved and presented to this Court.  Extensive motions

practice has already occurred; the Court has issued two separate detailed, substantive rulings on such motions; the parties have engaged in extensive efforts to gather contact information for putative collective members; Plaintiffs' counsel has retained a third-party administrator to contact the putative collective members and gather opt-in forms; Plaintiffs' counsel has retained an expert witness to analyze the ASN-POD Reports and help generate both projected damages for this case and the projected *pro-rata* distribution for each Plaintiff; and the parties jointly retained the services of an expert mediator to assist in resolving this case.  This case has already involved great expense, particularly for expert witnesses, the third-party administrator, and the mediator, as well as a significant amount of attorney hours and effort.  If this settlement is not approved, additional discovery, depositions, and expert depositions must still be conducted; significant additional motions practice will be litigated; and a trial must be held, followed by the inevitable appeals of the losing side.  Such future proceedings would entail great expenditures of time and money in this case on both sides, as well as great uncertainty for both sides.

Moreover, much of this litigation has unfolded in the shadow of an ongoing global pandemic, which has increased the complexity and likely duration of this case had it not settled. Normal litigation activities have been altered and made more difficult by the Covid-19 crisis.  As new variants of the virus continue to emerge and spread, such complexity and duration could easily continue to increase.

In short, it is clear that "proceedings have progressed to a stage sufficient to permit the parties and their counsel to obtain and review evidence, to evaluate their claims and defenses and to engage in informed arms-length settlement negotiations with the understanding that trial would be a difficult and costly undertaking," which weighs in favor of settlement approval.  *Jarrell v. Charleston Area Med. Ctr., Inc.*, 2018 U.S. Dist. LEXIS 161576, at *6 (S.D. W. Va. 2018) (quoting

*Irvine v. Destination Wild Dunes Mgmt., Inc.*, 204 F. Supp. 3d 846, 849 (D.S.C. 2016)).  The second factor is satisfied.

*Third*, "[t]here is no evidence of fraud or collusion here, and indeed 'there is a presumption that no fraud or collusion occurred between counsel in the absence of any evidence to the contrary.'" *Robert Newlin Airport*, 2019 U.S. Dist. LEXIS 152843, at *9 (quoting *Lomascolo*, 2009 WL 3094955, at *12); *see also Jarrell*, 2018 U.S. Dist. LEXIS 161576, at *6 ("[B]ecause the record lacks evidence of fraud or collusion, this Court 'presumes none occurred.'" (quoting *Irvine*, 204 F. Supp. 3d at 850)).  "[T]here is simply no evidence of fraud or collusion." *Young*, 2020 U.S. Dist. LEXIS 148989 at *10.   Not only is there no evidence of fraud or collusion, all evidence points in the opposite direction.  As in *Mayhew*, "[l]itigation was 'hotly contested' and the parties negotiated the settlement at arms-length" with the assistance of an independent and highly experienced FLSA mediator.  2020 U.S. Dist. LEXIS 53127, at *7.  The third factor is satisfied.

*Fourth*, the experience of counsel who have represented the Plaintiffs is extensive.  As this Court has previously recognized, "there is no doubt that Plaintiffs' attorneys are extremely experienced." *Young*, 2020 U.S. Dist. LEXIS 148989 at *10.  Thomas R. Goodwin has been practicing law in West Virginia for more than fifty years.  He is one of the most experienced attorneys in the state and has handled all types of litigation in both trial and appellate courts on a wide variety of issues.  Multiple other attorneys and legal assistants from Goodwin & Goodwin have also assisted with this litigation at various times.  Susan Wittemeier and Jeff Vollmer have provided substantial direct representation for Plaintiffs in this case.  Ms. Wittemeier has practiced extensively throughout state and federal courts in West Virginia for almost forty years.  Mr.

Vollmer has practiced in West Virginia for more than fifteen years and previously served as a law clerk in the Southern District of West Virginia.

Similarly, Plaintiffs' counsel and Goodwin & Goodwin's co-counsel in this matter, Lichten & Liss-Riordan, P.C., have been pioneers in workers' rights and wage and hour cases over the past decade and the firm's attorneys are highly experienced.  Attorney Harold Lichten, *pro hac vice* counsel for Plaintiffs, has been lead or co-counsel in numerous wage and hour cases in the United States, and has successfully argued cases arising under state and federal wage laws before the numerous circuit Courts of Appeal and the Supreme Courts of New Jersey and Massachusetts. *See,* e.g., *Hargrove v. Sleepy's LLC*, 974 F.3d 467 (3d Cir. 2020) (decision clarifying the Third Circuit's "ascertainability" requirement in Rule 23 class action brought by misclassified delivery drivers); *Rittmann v. Amazon.com, Inc.*, 971 F.3d 904 (9th Cir. 2020) (affirming denial of defendant's motion to compel arbitration in wage and hour class action brought on behalf of delivery drivers); *Waithaka v. Amazon.com, Inc.,* 966 F.3d 10 (1st Cir. 2020) (same); *Bedoya v. Am. Eagle Express Inc.,* 914 F.3d 812, 815 (3d Cir. 2019) (affirming that misclassified delivery drivers' claims under New Jersey's wage laws were not preempted by federal law); *Costello v. BeavEx, Inc.*, 810 F.3d 1045 (7th Cir. 2016) (affirming denial of defendant's motion for summary judgment and vacating District Court's denial of class certification in wage and hour action); *Scantland v. Jeffry Knight, Inc.,* 721 F.3d 1308 (11th Cir.2013) (reversing grant of summary judgment to Defendants in FLSA action); *Hargrove v. Sleepy's, LLC*, 220 N.J. 289, 106 A.3d 449 (2015); *Schwann v. FedEx Ground Package Sys., Inc.*, 813 F.3d 429 (1st Cir. 2016); *Chambers v. RDI Logistics, Inc.*, 65 N.E.3d 1 (Mass. 2016); *Somers v. Converged Access, Inc.,* 911 N.E.2d 739 (Mass.2009); *see also* Ex. D, Lichten Decl. at ¶ 6.  Zach Rubin has worked closely with Harold Lichten on numerous wage and hour cases since joining the firm in 2019.  Before working for

Lichen & Liss-Riordan, he worked at a prominent plaintiffs' labor and employment firm in Connecticut. Mr. Rubin has a growing track record of obtaining successful client outcomes and helping to establish favorable precedents for workers' rights. The experience of Plaintiff's counsel favors settlement approval.

*Fifth*, although the parties may differ in their respective assessments of the probability of Plaintiffs' success on the merits, they agree that the total settlement amount accurately reflects such probability (and, conversely, also reflects the risks attendant to both sides in further litigation). Plaintiffs have already won certain significant legal rulings on key issues, namely, conditional certification of the nationwide FLSA collective at issue in this case and the rejection of Omnicare's motion to dismiss and motion to strike. Risks, of course, remain for both sides. Plaintiffs, by way of example, would still need to prove that the IRS Rate should be adopted as the proper reimbursement rate before or during the trial. The mileage reimbursement rate ultimately adopted by the Court or the jury would have a tremendous impact on the damages of the drivers, and, if such rate were substantially lower than the IRS Rate, it could even eliminate the drivers' damages completely. Also significantly, the question of whether Omnicare is a joint employer of the plaintiffs remains as a primary issue, since the drivers actually were paid by their respective courier company and were classified as independent contractors. These and other issues would need to be litigated in full before or during the trial and provide useful examples of the complexity and risk that remain for both sides. Moreover, many of these issues were tried to a jury in *Young*, and Omnicare prevailed, further illustrating the risk attendant to both sides if litigation were to continue. The parties appear to have carefully weighed all such complexity and risk with the help of a very experienced FLSA mediator, and all sides believe in good faith that the instant proposed settlement accurately and fairly reflects such complexity and risk. *See, e.g. Young*, 2020 U.S. Dist.

LEXIS 148989 at *11 ("whatever weight counsel's experience and opinion carries here, it supports a finding that the proposed settlement is fair and reasonable" (quoting *Senior*, 2019 U.S. Dist. LEXIS 152843, 2019 WL 4267488 at *3)).  The fifth factor weighs in favor of settlement.

*Sixth*, the amount of the settlement is very significant in relation to the potential recovery, and "courts are entitled to rely on the judgment of counsel for the parties in performing the balancing task necessary to reach a settlement."  *Id.* (quoting *Weller v. Dolgencorp, In.c*, No. 3:09-CV-22, 2011 U.S. Dist. LEXIS 3546, 2011 WL 121914, at *3 (N.D.W. Va. Jan. 13, 2011).  Plaintiffs contend that if they enjoyed their "best" day in court, and won on all key pending issues before or during the next trial—i.e., if the jury adopted Plaintiffs' expert's calculations in full, found willfulness against Omnicare and imposed a three-year statute of limitations, and selected the IRS Rate as the proper measurement of vehicular expenses—Plaintiffs estimate they could recover approximately $18,500,000.00 in actual damages (excluding liquidated damages, which would double the compensatory award if granted by the Court following trial).  If Plaintiffs failed to prove willfulness, and only received a two-year statute of limitations, that estimated amount of base compensatory damages could fall to approximately $12,000,000.00.  If Omnicare prevailed at trial, and won a defense verdict as it did during the first trial in *Young* (which was subsequently overturned under Rule 60), Plaintiffs would receive nothing.

Weighed against such potential outcomes, the settlement of $11,900,00.00—with almost $8,000,000.00 of that amount going directly to the Plaintiff drivers—is substantial and reflects a meaningful percentage of Plaintiffs' estimated potential recovery.  It is nearly two-thirds of Plaintiffs' "best" estimated base compensatory damages that could be awarded, and the total settlement also almost equals the estimated base amount that Plaintiffs would receive under a two-year statute of limitations.  The "net" settlement amount flowing directly to Plaintiffs is 80% of

the estimated amount they could recover at trial under a two-year statute of limitations.  And, of course, the settlement amount far exceeds (yet still reflects) the possibility that Omnicare would obtain a defense verdict and Plaintiffs would receive nothing.  More specifically, based on plaintiffs` counsels' calculations, and assuming all opt in class members cash their checks, the range of likely recoveries will approximately $23,000 on the high end and $100 on the low end, with the average share being over $6,000.

The amount of the settlement thus weighs squarely in favor of settlement approval.  *See, e.g., Harper v. Elk Run Coal Co.*, 2012 U.S. Dist. LEXIS 76876, at *10 (S.D. W. Va. 2012) ("[B]ased on the parties' own judgments as to the likelihood of success on the merits and the costs of litigation, the amount of the settlement is reasonable in relation to the potential recovery.  In light of these factors, the court concludes that the settlement agreement, as a whole, is fair and reasonable."); *see also In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 523 (E.D. Mich. 2003) ("The prospect of a trial necessarily involves the risk that Plaintiffs would obtain little or no recovery.").  The proposed settlement is fair and reasonable in amount under the sixth factor. *Young*, 2020 U.S. Dist. LEXIS 148989 at *12.

## VI.  Costs and Attorneys' Fees

"Under the FLSA, a prevailing plaintiff is entitled to 'a reasonable attorney's fee to be paid by the defendant, and costs of the action.'" *Mayhew*, 2020 U.S. Dist. LEXIS 53127, at *8 (quoting 29 U.S.C. § 216(b)).  "In evaluating attorney fees, the court first must calculate the 'lodestar' figure by multiplying the number of hours reasonably expended by a reasonable rate." *Id.*; *see also Young*, 2020 U.S. Dist. LEXIS 148989 at *12-13.  The Fourth Circuit has provided the following factors for district courts to consider in making this lodestar determination:

(1) The time and labor expended; (2) the novelty and difficulty of the questions raised, (3) the skill required to properly perform the legal services rendered; (4) the

> attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation, and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorney's fees awards in similar cases.

*Mayhew* at *8-9.  Not all of these factors are relevant to this case, but those that are relevant all support the fee award that has been agreed to by the parties as part of this settlement.

The billing rates for Thomas R. Goodwin, Susan C. Wittemeier, and Jeff Vollmer have previously been approved by this Court.  *Young*, 2020 U.S. Dist. LEXIS 148989 at *14 ("Moreover, as to the hourly rates of the multiple attorneys from Goodwin & Goodwin involved in this matter, the Court concludes that the rates are reasonable and in line with the prevailing rates in this jurisdiction.").  The individual lodestar factors also weigh squarely in favor of approval.

*First*, in this case, attorneys and paralegals from Goodwin & Goodwin have expended 2,606.20 hours prosecuting Plaintiffs' claims, as submitted by affidavit of counsel.  Based on these records, Goodwin & Goodwin has performed $942,700.00 of hourly work on this matter at its usual rates.  In addition to these substantial amounts of time and labor expended by attorneys and paralegals, Plaintiffs' counsel has expended $59,632.86 in out-of-pocket costs, including $42,680.63 for expert data analyst work to utilize the voluminous electronic delivery data at the heart of this case.  As of October 6, 2021, the total amount of fees (based on usual hourly rates) and costs invested in this matter by Goodwin & Goodwin is $1,002,332.86.

Attorneys and paralegals from Lichten & Liss-Riordan have expended approximately 640 hours prosecuting Plaintiffs' claims, as submitted by affidavit of counsel.  In addition to these substantial amounts of time and labor expended by attorneys and paralegals, Lichten & Liss-Riordan has expended $46,810.37 in out-of-pocket costs, including $17,162.37 for expert data

analyst work to utilize the voluminous electronic delivery data at the heart of this case.  In addition to these expert witness expenses, Senior Paralegal and Data Analyst, Rebecca Shuford, also spent significant time working with Plaintiffs' counsel on all facets of the case from pre-litigation through mediation and settlement.

*Second*, this litigation involved novel and difficult questions.  Beginning with *Young* and continuing through this case, Defendant's delivery information, including the ASN-POD Reports, required the creation of proprietary, unique software by Plaintiffs' expert data analyst.  The data analysis alone has required a substantial amount of novel problem-solving to make sense of the electronic information, organize it into a useable form, fill in certain gaps and inconsistencies within it, and use it to calculate the best available estimates for Plaintiffs' vehicular expenses and wage underpayments.  Plaintiffs' counsel retained this same expert data analyst for this case, at considerable expense.  The expert analyzed the voluminous delivery data to assist in the preparations for the mediation, and his work played a significant role in permitting the parties to resolve this case successfully.

Furthermore, in an effort to make the distribution of the settlement funds as fair, accurate, and equitable as possible, Plaintiffs retained the expert again to provide additional services following the mediation.  Specifically, Plaintiffs asked the expert to re-run all of the calculations to account for newly-available information regarding certain opt-in delivery drivers, in order to generate the most accurate *pro-rata* distribution (based on number of weeks worked) that is possible in this case.  Plaintiffs expended $25,518.25 on this additional analysis, after the mediation had been completed and the settlement reached.  Of note, Plaintiffs' counsel is not seeking a separate award from the fund of any of their costs and expenses—all costs and expenses

are proposed to be recovered from the one-third percentage award of the fund for which the parties jointly seek approval of the Court.

*Third*, the parties respectfully submit that a high degree of skill was required by Plaintiffs' counsel to perform the services rendered for Plaintiffs in this case. This case thoroughly tested all facets of litigation expertise. Plaintiffs' counsel successfully navigated all of these obstacles during the more than two years of litigation in which this case has unfolded, and ultimately obtained a substantial recovery for the delivery drivers in this case. Also of note, Defendant Omnicare is represented by an extremely experienced and talented group of attorneys from Seyfarth Shaw who specialize in defending this type of wage and hour litigation.

*Fourth*, *fifth*, *sixth*, and *seventh*: Plaintiffs' counsel absorbed significant opportunity costs from pursuing this case to completion, as evidenced by the volume of hours worked by attorneys and paralegals at Goodwin & Goodwin and Lichten & Liss-Riordan. The amount of fees and costs provided for in this agreed settlement are in line with customary fee arrangements in cases like this, as shown by the total lodestar figure (including all time, fees, and costs) of $1,396,143.23.[4] *See* ECF No. 117, Joint Motion, at Ex. C, Decl. of Thomas R. Goodwin, at ¶ 6; *and* Ex. D, Lichten Decl. at ¶¶ 20-24 (outlining fees and costs). The agreed fee award also matches normal contingency fee arrangements in West Virginia which typically provide for costs to be recovered from the total settlement or verdict plus a contingency fee percentage of 33% (here, as noted above, Plaintiffs' counsel do not seek a separate recovery of costs from the total settlement—all costs will be recouped from the requested one-third recovery).

---

[4] Because Plaintiffs' counsel is not separately seeking to recover their out-of-pocket costs (i.e., the costs are included in the one-third amount allotted for both fees and costs), this lodestar calculation includes Plaintiffs' counsel's costs.

*Eighth*, the amount obtained for Plaintiffs is substantial and reflects a significant percentage of the amount in controversy in this case.  As set forth above, the settlement amount reflects a substantial percentage of Plaintiffs' estimated possible damages recoveries at trial—if a victory would in fact be achieved in the trial.  Given the risks involved, the Plaintiff drivers are receiving an excellent recovery of their alleged lost wages.  Each Plaintiff driver will receive a pro-rated share based on Plaintiffs' expert data analyst's calculations of each driver's respective weeks worked.

*Ninth*, *tenth*, and *eleventh*: the parties respectfully submit that the experience, reputation, and ability of Plaintiffs' counsel supports settlement approval.  As noted above, Thomas R. Goodwin and his firm have been litigating throughout state and federal courts in West Virginia for the past fifty years.  During that time, Goodwin & Goodwin has served or is currently serving as counsel for plaintiffs and defendants in a variety of class, collective, and mass tort actions.[5]  *See also*, ECF No. 117, Joint Motion, at Ex. D, Lichen Declaration at ¶¶ 5-7; p. 14 *infra* (describing Lichten & Liss-Riordan and Harold Lichten's body of work and track record).  The length and difficulty of this case, and the results achieved, further demonstrate the ability of Plaintiffs' counsel

---

[5]    Including, but not limited to: *Davis v. Omnicare, Inc. et al.*, USDC Eastern District of Kentucky, 5:18-cv-00142-REW-MAS; *Hager v. Omnicare, Inc.*, USDC Southern District of West Virginia, 5:19-cv-00484; *Ferrell, et al. v. U-Haul Co. of West Virginia*, Circuit Court of Kanawha County, West Virginia, 11-C-1426; *Spotloe v. Eastern American Energy Corporation*, Circuit Court of Barbour County, West Virginia, 06-C-53; *Burge v. Bank of America NA*, Circuit Court of Braxton County, West Virginia, 18-C-44; *Bank of America, NA v. Winfree*, Circuit Court of Mercer County, West Virginia, 18-C-238; *Shuff v. Bank of America, NA*, USDC Southern District of West Virginia, 5:20-C-184; *Bank of America, NA v. Burgess*, Circuit Court of Logan County, West Virginia, 18-C-197; *Eads v. Kohl's Department Stores, Inc.*, USDC Southern District of West Virginia, 16-C-12642; *Michael Sheridan, et al. v. Citizens Telecommunications Company of West Virginia d/b/a Frontier Communications of West Virginia, et al.,* Circuit Court of Lincoln County, West Virginia, 14-C-115; *Stand Energy Corporation v. Columbia Gas Transmission Corporation*, USDC Southern District of West Virginia, 2:04-cv-00867; *Dijkstra v. Carenbauer et al*, USDC Northern District of West Virginia, 5:11-cv-00152; *Alig et al v. Quicken Loans Inc. et al*, USDC Northern District of West Virginia, 5:12-cv-00114.

and support settlement approval.  (The tenth and eleventh factors, regarding the undesirability of the case and the length of relationship between counsel and Plaintiffs, are not relevant here.)

*Twelfth*, and finally, attorney's fee awards in similar cases support approval of this settlement in its entirety.  The proposed payment of fees and costs to Plaintiffs' counsel that has been agreed upon by the parties is one-third of the total recovery.  A one-third award of fees, especially when, as here, such award includes all costs incurred by Plaintiffs' counsel in the action, is reasonable in this jurisdiction.  As Judge Chambers recently held regarding FLSA fee awards in the Southern District of West Virginia, "courts in this district typically uphold fee awards that approach 50% if the lodestar calculations behind those awards are reasonable."  *Robert Newlin Airport*, 2019 U.S. Dist. LEXIS 152843, at *15 (collecting cases).

Here, the total lodestar calculation is $1,396,143.23. The fee and cost award agreed to by the parties in this settlement is $3,966,666.00.  This agreed amount is 2.84 times the lodestar calculation.  This multiplier is well within the range of multipliers that obtain approval in the Southern District of West Virginia, the Fourth Circuit, and in other federal courts. *See, e.g., Kay Co. v. Equitable Prod. Co.*, 749 F. Supp. 2d 455, 470 (S.D.W. Va. 2010) (upholding a lodestar multiplier range of 3.4 to 4.3 and observing that "[c]ourts have generally held that lodestar multipliers falling between 2 and 4.5 demonstrate a reasonable attorneys' fee"); *Reynolds v. Fid. Invs. Institutional Operations Co., Inc.*, No. 1:18-CV-423, 2020 WL 92092, at *4 (M.D.N.C. Jan. 8, 2020) ("Fourth Circuit district courts have approved awards that are multiple times greater than lodestar amounts."); *Jernigan v. Protas, Spivok & Collins*, No. ELH-16-03058, 2017 U.S. Dist. LEXIS 154241, at *8 ("Courts have generally held that lodestar multipliers falling between 2 and 4.5 demonstrate a reasonable attorneys' fee." (quoting *Singleton v. Domino's Pizza, LLC*, 976 F. Supp. 2d 665, 689 (D. Md. 2013))); *and* (Thomas Eisenberg & Geoffrey P. Miller, *Attorney Fees*

*and Expenses in Class Action Settlements: 1993-2008*, 7 J. EMPIRICAL LEGAL STUD. 248, 273 (2010) (finding that the mean multiplier in the Fourth Circuit was 2.43 in a study of cases between 2003-2008).  Indeed, other courts across the country have approved multipliers of far higher than what is at issue here.[6]

## VII.  Conclusion

For the foregoing reasons, the Court finds the proposed settlement agreement is fair and reasonable in light of the bona fide disputes existing in this matter under the FLSA.  The Court also finds that the proposed attorney's fee and costs award is reasonable.  The Court also approves the agreed incentive payment of $10,000 to the lead Plaintiff Cathy Hager for her service in this lawsuit.  Accordingly, the Court **GRANTS** the parties Joint Motion for Court Approval of Settlement [Doc. 117], **APPROVES** the parties Settlement Agreement [Doc. 117, Ex. A], and **DISMISSES** this matter **WITH PREJUDICE**.[7]

---

[6]     *See, e.g.*, *Williams v. Rohm and Haas Pension Pl,* No. 04-0078-SEB, 2010 WL 4723725 (S.D. Ind. Nov. 12, 2010), *aff'd,* 658 F.3d 629 (7th Cir. 2011), Dkt. 317-2 (where the lodestar calculation was $7.43 million and the fee award was $43.5 million, the multiplier was 5.85); *In re Household Int'l ERISA Litig.,* No. 02 Civ. 7921 (N.D. Ill. Nov. 22, 2004); (where the court awarded 30% of the $46.5 million settlement fund, the multiplier was 4.8); *In re Cenco, Inc. Secs. Litig.,* 519 F. Supp. 322, 327 (N.D. 111. 1981) (multipliers of 4 and 2); *Arenson v. Bd. of Trade of City of Chi.,* 372 F. Supp. 1349, 1359 (N.D. 111. 1974) (multiplier of 4); *In re Rite Aid Corp. Sec. Litig.,* 362 F. Supp. 2d 587, 589 (E.D. Penn. 2005) (multiplier of 6.96*); In re Charter Commc'ns, Inc., Sec. Litig.,* No. 4:02-CV-1186 CAS, 2005 WL 4045741, at *18 (E.D. Mo. June 30, 2005) (multiplier of 5.61);  *see also Beckman v. KeyBank N.A.,* 293 F.R.D. 467, 481–82 (S.D.N.Y 2013) (granting an approximately 6.3 multiplier); *Steiner v. Am. Broad. Co.,* 248 F. App'x 780, 783 (9th Cir. 2007) (multiplier of approximately 6.85 "falls well within the range of multipliers that courts have allowed"); *Vizcaino v. Microsoft Corp.,* 290 F.3d 1043, 1052 (9th Cir. 2002) (listing nationwide class action settlements where multiplier ranged up to 19.6 times lodestar).  *See also* Alba Conte, *Attorney Fee Awards* § 2.06, at 39 (2d ed. 1993) ("When a large common fund has been recovered and the hours are relatively small, some courts reach a reasonable fee determination based on large multipliers of 5 or 10 times the lodestar.").

[7]     The Court retains jurisdiction to enforce the Settlement Agreement if needed.

The Court directs the Clerk to send a copy of this Order to counsel of record and to any unrepresented parties.

ENTER:          November 15, 2021

Frank W. Volk
United States District Judge

Prepared and agreed to by:


*On Behalf of Plaintiff:*
**GOODWIN & GOODWIN, LLP**

*/s/ Thomas R. Goodwin*
Thomas R. Goodwin (WV Bar No. 1435)
Susan C. Wittemeier (WV Bar No. 4104)
W. Jeffrey Vollmer (WV Bar No. 10277)
300 Summers Street, Suite 1500
Charleston, WV 25301
(304) 346-7000
trg@goodwingoodwin.com
scw@goodwingoodwin.com
wjv@goodwingoodwin.com


**LICHTEN & LISS-RIORDAN, P.C.**
Harold L. Lichten (pro hac vice)
Zachary L. Rubin (pro hac vice)
729 Boylston St., Suite 2000
Boston, MA 02116
(617) 994-5800
Hlichten@llrlaw.com
zrubin@llrlaw.com

*On Behalf of Defendants:*
**DINSMORE & SHOHL LLP**

*/s/ Ashley C. Pack*
Ashley C. Pack (WV Bar No. 10477)
Anna M. Dailey (WV Bar No. 4525)
707 Virginia St. E., Suite 1300
Charleston, WV 25301
Tel.: (304) 357-9937
ashley.pack@dinsmore.com
anna.dailey@dinsmore.com


**SEYFARTH SHAW LLP**
James J. Swartz (pro hac vice)
Nancy E. Rafuse (pro hac vice)
J. Stanton Hill (pro hac vice)
Andrew McKinley (pro hac vice)
1075 Peachtree Street, N.E., Suite 2500
Atlanta, GA 30309-3958
Telephone: (404) 885-1500
Facsimile: (404) 892-7056
jswartz@seyfarth.com
nrafuse@seyfarth.com
shill@seyfarth.com
amckinley@seyfarth.com